## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

In re: LORI JOHNSON, Debtor                       No. 5:12-bk-74167
                                                         Ch. 7


**LORI JOHNSON**                                            **PLAINTIFF**

**v.**                    **No. 5:13-ap-07010**

**SALLIE MAE, INC.**                                        **DEFENDANT**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**LORI JOHNSON**                                            **PLAINTIFF**

**v.**                    **No. 5:13-ap-07011**

**NATIONAL COLLEGIATE TRUST, THE EDUCATION
RESOURCES INSTITUTE, INC., and DAPHNE SOLOMON**      **DEFENDANTS**


### OPINION

Lori Johnson [the debtor] filed her bankruptcy petition on December 30, 2009, in Las
Vegas, Nevada, and received her discharge on April 7, 2010.  Her case was closed on
June 14, 2010.  Prior to getting her discharge, the debtor moved to Springdale, Arkansas,
and later petitioned the Nevada bankruptcy court to reopen and transfer her case to the
Western District of Arkansas for the purpose of filing adversary complaints seeking a
determination of the dischargeability of multiple student loan debts under
11 U.S.C. § 523(a)(8).  The Nevada bankruptcy court granted the debtor's motion on
October 17, 2012, and the case was transferred to this Court on November 8, 2012.

On February 8, 2013, the debtor filed three adversary proceedings against the following
student loan defendants: (1) Sallie Mae, Inc. [Sallie Mae] in 5:13-ap-07010; (2) National
Collegiate Trust [National Collegiate], The Education Resources Institute, Inc., and
Daphne Solomon in 5:13-ap-07011; and (3) Educational Credit Management Corporation

[ECMC] in 5:13-ap-07012.  After answers were filed, the three adversary proceedings were consolidated for purposes of trial.[1]  The debtor later dismissed her complaint against ECMC, and the Court held a hearing on the two remaining adversary proceedings on February 27, 2014, after which the Court took the matters under advisement.  For the reasons stated below, the Court denies the debtor's complaints against Sallie Mae and National Collegiate.

## BACKGROUND

The debtor seeks to discharge student loans that accrued from two separate educational endeavors.  In December 1996, the debtor graduated from Central Washington University with two bachelor's degrees: one in theater arts with an emphasis in children's education, and one in elementary education.  Almost 10 years later, the debtor returned to school and graduated in May 2008 from Chapman University in California with a masters degree in film production/directing.  In all, the debtor contracted for ten separate student loans that currently total approximately $317,370.00:  one loan from National Collegiate; four private loans from Sallie Mae; two federal loans from Sallie Mae; and three federal loans currently held by an entity identified by the debtor as ACS [the third lender], which is the successor in interest to ECMC.[2]  The only loans before the Court in this proceeding are the four private loans from Sallie Mae and the one loan from National Collegiate.[3]

---

[1]  In 5:13-ap-07011, only one of the three defendants–National Collegiate–filed an answer to the complaint.  The debtor dismissed the second defendant, The Education Resources Institute, Inc.  The debtor filed a motion for default against the third defendant, Daphne Solomon, but subsequently withdrew the motion.  At the time of the hearing, Solomon still had not filed an answer to the debtor's complaint, but the debtor did not attempt to resurrect her motion for default against Solomon.

[2]  With the exception of the student loan debt owed to National Collegiate, which originated in May 2006 in the amount of $17,500.00, the Court does not have evidence of the origination date or initial principal amount of each loan.

[3]  At this time, the third lender is in the process of consolidating the debtor's federal loans–two federal Sallie Mae loans and three loans that were held by ECMC–and establishing an income contingent repayment plan for the debtor.  This settlement prompted the dismissal of the third adversary proceeding, 5:13-ap-07012.  Therefore, a

Neither field of study–education or film–has yielded steady employment for the debtor. After graduating with her education degrees in December 1996, the debtor had two brief stints in teaching:  first as a teacher in California for six months, and then as a teacher in Washington for two weeks.  Following that, the debtor was hired as an executive assistant at Group Health Cooperative.  She estimated that she was earning $42,000.00-$43,000.00 in that position when she left in 2004 to begin her studies at Chapman University.

After graduating with her masters degree in film production/directing in May 2008, the debtor moved to Hollywood to pursue a career as a film director.  However, although she applied for many jobs related to film and followed all known leads, she was unable to find any work in this highly competitive field and was forced to turn to temp agency work.  She later was hired as an assistant at a law firm and worked there until September 2009, when she was terminated for missing too much work while caring for her ill mother, who lived in Las Vegas.  The debtor's federal income tax returns for 2008 and 2009, which were entered into evidence, show that her taxable income was $30,352.00 and $37,169.00 for those years, respectively, when she worked at the law firm as an administrative assistant.

After the termination of her job and the death of her mother, the debtor moved to Las Vegas in late 2009 to settle her mother's estate.  She relied on unemployment benefits and continued to apply for film positions and other general employment with no success. She stated that Las Vegas had been hit particularly hard by the downturn in the economy, and that jobs in almost any field were impossible to find.  Finally, faced with mounting living expenses, the debtor relocated to Springdale, Arkansas, in February 2010 to be close to family living in this area.  The debtor relied on mixed income received from

_____

portion (approximately $198,000.00) of the total student loan debt is no longer before this Court for determination of dischargeability.

unemployment benefits, wages from temp agencies, and wages from substitute teaching in 2010 and 2011.  The debtor's federal tax returns show that her taxable income was $24,200.00 in 2010 (from unemployement) and $9924.00 in 2011 (from unemployment and wages).  In 2012, according to the debtor's W-2s that were entered into evidence, the debtor earned a total of $30,970.58, the majority of which was wages from Mitchell Communications Group, LLC, her present employer.

The debtor has worked at Mitchell Communications Group, LLC for two years now–advancing from a temporary worker in February 2012, to administrative assistant in May 2012, to executive assistant beginning in August or September 2013.  Upon the most recent promotion, her salary increased from approximately $32,000.00 to $40,000.00 a year.  A calculation based on her bi-weekly gross pay shows that her current salary is $43,333.16 a year.  Other than minor yearly increases in her salary, additional advancement is unlikely for the debtor because she is already at the highest position of that kind at Mitchell Communications Group, LLC, assisting the company's president and CEO.  While she has considered taking a second job for supplemental income, the debtor believes that the time commitment would prevent her from fully dedicating herself to her current job, which requires 45-60 hours per week, including weekends.  When asked how comfortable she is with her position in terms of job retention, the debtor responded that she is "very comfortable."

The debtor is a well-spoken 48-year old woman with no known disabilities that would limit her ability to continue to earn income.  She received a discharge of unsecured debt (other than her student loans) in 2010, and her income is modestly comfortable for a single person with no dependents.  Her only apparent obstacle is the sheer amount of student loan debt she currently owes to Sallie Mae and National Collegiate, in addition to the amount owed to the third lender.  The debtor testified that despite regular communication with her lenders about her inability to make the required monthly payments–including multiple attempts to enter into loan modifications and taking the maximum deferments offered–her monthly payment amounts continue to exceed her

4

available monthly income.   Accordingly, the debtor asks this Court to find that her

student loans owed to Sallie Mae and National Collegiate place an undue hardship on her

and are dischargeable under § 523(a)(8).

**LAW AND ANALYSIS**

The Eighth Circuit has adopted a totality-of-the-circumstances test for making a

determination of undue hardship under § 523(a)(8).  *Long v. Educ. Credit Mgmt. Corp.*

(*In re Long*), 322 F.3d 549, 554 (8th Cir. 2003).  Under this test, a bankruptcy court must

consider the following factors: (1) the debtor's past, present, and reasonably reliable

future financial resources; (2) a calculation of the debtor's and her dependent's

reasonable necessary living expenses; and (3) any other relevant facts and circumstances

surrounding each particular bankruptcy case.  *Long*, 322 F.3d at 554 (*citing Andresen v.*

*Neb. Student Loan Program, Inc.* (*In re Andresen*), 232 B.R. 127, 132 (B.A.P. 8th Cir.

1999)).  Other relevant facts and circumstances that courts have considered include:

> (1) the total present and future incapacity to pay debts for reasons not within the
> control of the debtor;
>
> (2) whether the debtor has made a good faith effort to negotiate a deferment or
> forbearance of payments;
>
> (3) whether the hardship will be long-term;
>
> (4) whether the debtor has made payments on the loan;
>
> (5) whether there is a permanent or long-term disability of the debtor;
>
> (6) the ability of the debtor to obtain gainful employment in the area of the study;
>
> (7) whether the debtor has made a good faith effort to maximize income and
>  minimize expenses;
>
> (8) whether the dominant purpose of the bankruptcy petition was to discharge the
> student loan;
>
> (9) the ratio of student loan debt to total indebtedness.

*Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 783-84 (8th Cir. 2009).  In total,

the chief inquiry is a balancing of finances–"if the debtor's reasonable future financial

resources will sufficiently cover payment of the student loan debt–while still allowing for

a minimal standard of living–then the debt should not be discharged." *Long*, 322 F.3d at 554. The debtor has the burden of proving by a preponderance of the evidence that she cannot afford to pay her student loan debt. *Jesperson*, 571 F.3d at 779. As the *Jesperson* court noted, this burden is rigorous. *Id.*

Determining what constitutes a minimal standard of living also requires a balancing of the circumstances because there is no statutory definition provided. Addressing this issue, one court provided the following considerations (internal citations omitted):

> On one end of the spectrum, it is clearly not enough for a debtor simply to demonstrate that payment of a student loan would require a readjustment of his financial situation or a diminution in lifestyle. A debtor is therefore not entitled to maintain the standard of living enjoyed before the filing of the petition. On the other hand, it is not necessary that a debtor live in abject poverty in order to demonstrate undue hardship and obtain a discharge of student loans.

*Shadwick v. U.S. Dept. of Educ. et al.* (*In re Shadwick*), 341 B.R. 6, 10-11 (Bankr. W.D. Mo. 2006) (citing *Educ. Credit Mgmt. Corp. v. Stanley* (*In re Stanley*), 300 B.R. 813, 817-18 (N.D. Fla. 2003)). Courts have found that a minimal standard of living includes the ability to pay for food, shelter, utilities, personal hygiene, clothing, medical and dental expenses, and recreation. *Id.* at 11. In the present case, the Court will examine each of the three factors set forth in the Eighth Circuit's totality-of-the-circumstances test to determine whether the debtor can maintain a minimal standard of living while also paying her student loan debts. The debtor's expenses will be addressed first.

1**. Reasonable Necessary Living Expenses**

The debtor testified at the hearing that her current expenses in 2014, not including monthly payments to Sallie Mae and National Collegiate, are approximately $2492.83 per month:[4]

---

[4] Comparing the debtor's current expenses with those listed in her Schedule J filed on December 30, 2009, highlights several substantial changes in her specific expenses: (1) a significant decrease in rent because the debtor moved from Las Vegas to

| | |
|---|---|
| Rent | $635.00 |
| Electricity | $150.00 |
| Cable/internet | $142.00 |
| Cell phone | $85.00 |
| Car ins | $90.00 |
| HSA[5] | $100.00 |
| Water | $20.00 |
| Food/groceries | $345.00 |
| Vehicle repair/fuel | $180.00 |
| Eating out | $70.00 |
| Gym | $9.00 |
| Recreation | $15.00 |
| Medical/dental | $85.00 |
| Clothing | $50.00 |
| Tax repayment | $25.00 |
| Tithe | $350.00-360.00 |
| Third lender[6] | $141.83 |

The Eighth Circuit has stated that in order for expenses to be reasonable and necessary, they must be "modest and commensurate with the debtor's resources." *Jesperson*, 571 F.3d at 780. While the total amount of monthly expenses must be reasonable, courts also scrutinize specific expenses to determine whether those expenses are unnecessary or excessive to the extent that funds can be reallocated to pay for the student loans the debtor seeks to discharge.

After reviewing the debtor's expenses covering groceries, rent, utilities, clothing, medical

_____

Springdale, Arkansas, where the cost of living is notably less; (2) a significant increase in food expenses because the debtor now lives alone (whereas she previously shared food expenses with an aunt who temporarily lived with her); (3) a significant increase in charitable donations because the debtor renewed her relationship with her church after filing bankruptcy; and (4) the lack of a monthly car payment because the debtor has since paid off her 2005 Ford Escape. Overall, the debtor's monthly expenses are approximately $200.00 more now than in 2009.

[5] HSA is the abbreviation for health savings account.

[6] The $141.83 listed is the expected monthly payment amount for the debtor's federal student loans, once consolidated by the third lender. See footnote 3.

and dental expenses, and recreation (including a gym membership), the Court finds that
these are necessary and also "modest and commensurate with the debtor's resources."
Specifically addressing the debtor's allowance of $100.00 for her HSA in addition to
$85.00 per month for health and dental expenses, the Court finds this falls within the
range of necessary and reasonable.  The debtor testified that she is catching up on a
significant amount of dental work and also has at least one prescription that costs
approximately $25.00 per month.  Similarly, the Court finds that $180.00 per month for
vehicle maintenance and gasoline is also reasonable and necessary.  The debtor stated
that she is in the process of making her nine-year old car "road worthy" by purchasing
new tires one at a time and resolving other issues.  While the debtor may reach a point at
which she has completed the dental work and car repairs she currently needs,
health/dental and transportation expenses are ongoing.  Additionally, $90.00 per month
for car insurance and $25.00 per month for repayment of a federal income tax arrearage
are necessary and reasonable.  The debtor estimated that the tax arrearage, which was
originally $1600.00, is now down to $300.00-400.00.  At $25.00 per month, this expense
will end in about a year and a half and those allocated funds can be used elsewhere.[7]

Four of the debtor's expenses remain: (1) $142.00 for cable/internet; (2) $85.00 for cell
phone; (3) $70.00 for eating out; and (4) $350.00 for tithing.  For the reasons set forth
below, the Court finds these expenses are either unnecessary, excessive, or
unsubstantiated.

Regarding the $142.00 cable/internet bill, the debtor stated that cable television is a
necessary expense because she must stay informed of the entertainment industry in order
to get a job in that field.  However, during the course of the trial, the debtor also testified
that (1) she has neither the money nor the personal connections needed to get her start in

---

[7]  The debtor entered into evidence the IRS's Form 9465, Installment Agreement
Request, showing her proposed payment of $25.00 per month for money owed on her
2010 federal income taxes.

8

the highly competitive industry of film and television; (2) she has been unsuccessful in getting any related job in the six years since graduation; (3) Springdale, Arkansas, is an unlikely place to pursue such a career; (4) she does not have enough money to relocate again; and (5) even if she did get a break-through internship in the future, she probably would receive little or no pay for her work.  With these facts, the Court must conclude that although the debtor aspires to pursue this career path, it is an endeavor that is neither affordable nor likely for her at this time.  Accordingly, the Court finds that cable is not a necessary expense needed by the debtor to find and hold a job in a different field, such as her current position as an executive assistant.  Multiple courts within the Eighth Circuit have also deemed cable to be an unnecessary expense under a § 523(a)(8) undue hardship analysis.  *See, e.g., In re McLaughlin*, 359 B.R. 746, 753 (Bankr. W.D. Mo. 2007) (cable is both unnecessary and unreasonable); *In re Golczewski*, 371 B.R. 392, 400 (Bankr. N.D. Iowa 2006) (although cable bill was not unreasonable per se, it was unnecessary); *In re Bott*, 324 B.R. 771, 776-77 (Bankr. E.D. Mo. 2005) (cable is a luxury); *In re Faktor*, 306 B.R. 256, 261 (Bankr. N.D. Iowa 2004) (cable is not a necessity); *In re VerMaas*, 302 B.R. 650, 658-59 (Bankr. D. Neb. 2003) (noting other courts' determination that cable is an excessive expense).

Finding that cable is not a necessary expense does not eliminate entirely the $142.00 monthly expense.  Some part of the total $142.00 per month expense is internet service.  The debtor testified that she occasionally works from home and needs the internet to do so.  For this reason, the Court finds that internet service is a necessary expense related to her job.  The internet can also continue to provide the debtor at least some access to the entertainment industry, which she alleges that she currently seeks through cable television.  The Court believes that $60.00 per month is a reasonable allotment for internet service.

Concerning her monthly cell phone bill, the debtor testified that she pays $85.00 for talk and text service only, without an internet data plan.   She testified that she is no longer bound by a service contract and acknowledged that she is willing to find a cheaper plan.

9

Although Verizon representatives told her she currently has the lowest possible rate, other providers offer more competitive rates for the same services the debtor currently has. Accordingly, the Court finds that $85.00 is excessive and instead will allot $50.00 for monthly cell phone expenses.

The debtor has also reserved $70.00 per month for eating out at restaurants. She estimated that she currently spends approximately $150.00 per month, mostly for weekday lunches, but that she is trying to lower that expense. It is the Court's opinion that $70 per month is excessive in the context of a § 523(a)(8) analysis. *See Gibson v. ECMC and College Assist* (*In re Gibson*), 428 B.R. 385, 390 (Bankr. W.D. Mich. 2010); *Southard v. Educ. Credit Mgmt. Corp.* (*In re Southard*), 337 B.R. 416, 420-21 (Bankr. M.D. Fla. 2006). However, the Court also acknowledges that the ability to seek quick, convenient lunches during the work week is often necessary for a person working outside the home. Accordingly, the Court reduces this expense from $70.00 to $50.00.

Finally, the debtor lists among her expenses approximately $350.00 per month in tithing to her church. Courts are split on whether tithing is a reasonable and necessary expense in the context of a § 523(a)(8) analysis. Congress's inclusion of language in § 1325(b)(2)(A)(ii) and § 548(a)(2) that specifically carves out an allowance for a debtor's charitable contributions–and the noticeable lack of similar language in § 523(a)(8)–has resulted in some bankruptcy courts interpreting Congress's silence to mean those contributions are not a reasonable and necessary expense in the context of student loan dischargeability. *See, e.g., Gizzi v. Educ. Credit Mgmt. Corp.*, 364 B.R. 250, 254 (N.D.W. Va. 2007); *Allen v. Am. Educ. Serv. et al.* (*In re Allen*), 329 B.R. 544, 552 (Bankr. W.D. Pa. 2005); *Ritchie v. Nw. Educ. Loan Ass'n* (*In re Ritchie*), 254 B.R. 913, 921 (Bankr. D. Idaho 2000). Other courts, including courts within the Eighth Circuit, find that tithing is not *per se* unnecessary and unreasonable. Of those courts holding that tithing is a reasonable and necessary expense, the debtor's history of committed charitable giving may be a relevant, if not deciding, factor. *See Halverson v. U.S. Dep't of Educ. et al.* (*In re Halverson*), 401 B.R. 378, 387 (Bankr. D. Minn. 2009); *In re*

10

*McLaney*, 314 B.R. 228, 237 (Bankr. M.D. Ala. 2004) *aff'd as modified,* 375 B.R. 666 (M.D. Ala. 2007). In the *Halverson* case, the court held that $209.42 per month was an acceptable expense, noting that the debtor's "personal history is entwined with his church membership, and suggests that his belief in financially contributing to his church is a long-held and sincere one." *Halverson*, 401 B.R. at 387. The court also noted that the debtor would still be unable to afford his student loans even if he discontinued tithing. Similarly, in the *McLaney* case, the court found that a $220.00 monthly charitable donation to the debtors' church was a reasonably necessary expense because "the debtors have a long history of consistent charitable giving. There is not a shred of evidence that their charitable giving expense was contrived for the purpose of discharging their student loans under the undue hardship exception."[8] *McLaney*, 314 B.R. at 237.

In the present case, the debtor testified that she has been a member of her church since she was nine years old, but her involvement has varied over the years. The debtor stated that even when she was a "very active" member, she did not regularly tithe. In the approximate 15 years prior to the filing of her adversary proceeding, she left the church altogether. However, at some time after filing her bankruptcy petition, the debtor renewed her relationship with her church. She testified that she now tithes 10% of her gross income each month, and that this obligation is a crucial aspect of her faith. When questioned about her commitment to tithe if faced with limited funds, the debtor responded, "I would still pay my tithing. It's the first thing I pay, no matter what."

Although the debtor stated that she is now wholly committed to monthly tithing, it is unclear when she began or intended to begin tithing consistently. Her Schedule J filed on December 30, 2009, lists only $5.00 in monthly charitable deductions, and the debtor stated that she was not active in the church at that time. Her federal income tax returns

---

[8] On appeal, the district court agreed with the *McLaney* court's conclusion that the charitable donation was a proper expense but found that the bankruptcy court erred in its determination that the allowance of charitable contributions under § 548 is applicable to a § 523(a)(8) analysis.

11

from 2007-2011 and 2013, which were entered into evidence, also shed no light on when the debtor began consistently tithing because the debtor did not itemize her deductions. In addition, the debtor testified that she pays her tithe by check, but when counsel for National Collegiate presented her with bank statements for February and March 2013, the debtor was unable to identify tithe payments for either month and finally admitted that she missed several months.  She stated that "something happened" but could not recall what prevented her from tithing during those months.  According to calculations made by counsel for Sallie Mae (with which the debtor agreed), the same February 2013 bank statement showed that the debtor spent $298.90 that month–almost the full amount of a tithe payment–eating out at restaurants 26 separate times.  The debtor stated that most of those charges were for lunches during work days.

Other than the debtor's testimony, which was partly contradicted by the two bank statements that evidenced a gap in her tithing, the debtor has presented no evidence to support that this is a monthly expense.  Although the debtor may be sincere in her desire to tithe, the Court does not have cancelled checks or other evidence to show that the debtor is paying approximately $350 per month.  In addition, the debtor does not have an established history of tithing to support this expense, like the debtors in the previously cited *Halverson* and *McLaney* cases.  Because this is a significant expense–the debtor's second largest, in fact–the Court must be assured that these funds are not available to pay her student loan creditors.  Based on a lack of sufficient evidence, the Court finds that the debtor has not met her burden of establishing that her tithing is a bona fide expense.[9]  The Court need not make a finding at this time whether, if proven, the expense would also be

---

[9]  An Ohio bankruptcy court, similarly faced with a lack of evidence, distinguished between tithing and other expenses: "Finally and perhaps most importantly, the Linvilles have failed to provide any proof or documentation, such as canceled checks or acknowledgments from the church, to support their budgeted tithing expenditures. Although unnecessary for routine expenses such as rent and food, such proof is required for extraordinary expenditures such as the Linvilles' budgeted tithe."  *Linville v. Hills Bank & Trust Co. et al.* (*In re Linville*), 95-60183, 1995 WL 783218 (Bankr. N.D. Ohio Dec. 12, 1995).

necessary and reasonable.

As a result of the Court's reduction of the debtor's expenses, the Court finds that the debtor's total monthly expenses are $2005.83 before factoring in student loan payments to Sallie Mae and National Collegiate. As discussed in the next section, a comparison of the debtor's reduced expenses with her monthly income shows that she has sufficient funds to make both student loan payments.

**2.  Past, Present and Reasonably Reliable Future Financial Resources**

Although the debtor has struggled with employment, particularly during the recession, she has proven herself capable of supporting herself, even if those jobs have not been related to her degrees. In the past 10 years, the debtor has been an administrative assistant once and an executive assistant twice (including her current job) with an average salary of about $40,000.00. Considering her past success in these positions, the Court does not have any reason to believe she will not continue to be successful in positions such as these. In addition, because she has no financial obligations to dependents and no known disabilities to prevent her from continuing to earn an income, the analysis here is a relatively straight-forward comparison of income versus expenses.

At the trial, the debtor's monthly income was loosely calculated as $2500.00 by doubling the debtor's bi-weekly net pay of $1258.94, the amount shown on her paystub. However, a more accurate calculation shows that her monthly income is $2727.70.[10] Factoring in the newly calculated monthly expenses of $2005.83, the debtor is left with $721.87 per month to make her student loan payments to Sallie Mae and National Collegiate. The evidence provided to the Court shows that the debtor's current monthly payment to National Collegiate is approximately $210.00. The debtor's monthly payment to Sallie Mae, according to a proposal made by Sallie Mae's counsel at the hearing, will be

---

[10]  This amount is reached by multiplying the debtor's bi-weekly net pay ($1258.94) by 26 weeks, and then dividing the result by 12 months.

13

$354.12.[11]  Together, the monthly student loans payments to these two lenders will be approximately $564.12, which is less than the $721.87 the debtor has available each month.  Accordingly, the Court finds that making payments to Sallie Mae and National Collegiate does not impose an undue hardship on the debtor.

At the hearing, the debtor also testified regarding expenses that may arise sometime in the future.  Although her 2005 Ford Escape works now, it will someday need to be replaced.[12]  The debtor testified that the company she works for is facing a buy-out and employees may have to begin paying $100.00-200.00 per month in health insurance premiums beginning January 2015.  She also anticipates that her student loan payment to the third lender will double next year according to the lender's online calculator.  In addition, some of her federal loans were not accounted for until recently, and she is unsure how this may affect her payment amount to the third lender in the future.

While a court should consider known future factors for a totality-of-the-circumstances test, undue hardship is measured as of the trial date.  *Bronsdon v. Educ. Credit Mgmt. Corp.* (*In re Bronsdon*), 435 B.R. 791, 800 (B.A.P. 1st Cir. 2010); *Rose v. Educ. Credit Mgmt. Corp.* (*In re Rose*), 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005).  A bankruptcy court "'may not engage in speculation when determining net income and reasonable and necessary living expenses.'"  *Walker v. Sallie Mae Serv. Corp. et al.*, 650 F.3d 1227, 1233 (8th Cir. 2011) (quoting *Jesperson*, 571 F.3d at 780).  The debtor's possible future expenses are speculative at this time, and she provided no evidence of those expenses' impending occurrence.  Therefore, the Court cannot factor those expenses against the debtor's available income.  In the case of the most compelling anticipated future

---

[11]  Counsel for Sallie Mae stated at the hearing that Sallie Mae has offered to reduce the debtor's total balance on the four private loans to $70,000.00, at two percent interest for 20 years, with a monthly payment of $354.12.

[12]  The Court notes that a modest monthly payment for a replacement vehicle would be offset somewhat by a reduction in the $180 per month expense the debtor currently has allotted for the repair and maintenance of her 2005 Ford Escape.

expense–that her payment to the third lender will double next year–the debtor currently has about $150.00 in excess monthly income that would be sufficient to cover that additional expense.

**3.  Other Relevant Facts and Circumstances**

At the hearing, both the debtor and the creditors developed facts that are applicable to some of the enumerated "other relevant facts and circumstances" to be considered in a totality-of-the-circumstances test.  The debtor testified about her inability to find work in the extremely competitive entertainment industry despite having a costly degree.  She also testified about her good-faith efforts to work with her lenders and make payments, and specified that she has never defaulted on any of her student loans.  Alternatively, counsel for Sallie Mae suggested through questioning of the debtor that she has failed to maximize income by not securing a teaching job, although no evidence was admitted to support the theory that the debtor would earn more as a teacher than she does now. Regardless, these considerations do not outweigh the Court's finding that the debtor has sufficient monthly income to make payments to Sallie Mae and National Collegiate while maintaining a minimal standard of living.

**Conclusion**

For the foregoing reasons, the Court finds that the student loans owed to Sallie Mae and National Collegiate are nondischargeable because the debtor did not prove by a preponderance of the evidence that these loans impose an undue hardship upon her.  As the Court stated previously, this determination is based on a review of the debtor's current monthly income and expenses.  Because the debtor's circumstances may change in the future (including the addition of substantiated expenses), the Court denies the debtor's request for relief without prejudice to the debtor seeking a new determination of dischargeability of her student loan obligations at such time.

15

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   04/30/2014

cc:     Samuel Frank Eastman
        Lori Johnson
        Burton E. Stacy, Jr.
        John Blume Buzbee
        Mac D. Finlayson
        Daphne Solomon
        U.S. Trustee

16